Below is an opinion of the court.

_____
TRISH M. BROWN
U.S. Bankruptcy Judge

**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| In Re: | Bankruptcy Case No. 19-30351-tmb13 |
|---|---|
| MELODY DAWN TAYLOR, | MEMORANDUM OPINION[1] |
| Debtor. | |

This matter came before the court on July 17, 2019 for an evidentiary hearing concerning Debtor Melody Dawn Taylor's proposed chapter 13 plan (ECF No. 30), and the motion for relief from stay filed by creditor Frederick W. Kreidler IRA, LLC (ECF No. 37). Debtor was represented at the hearing by Ted Troutman; the Kreidler IRA and Anne Marie Kreidler (collectively, the "Objecting Creditors") were represented by Troy Sexton; and the trustee was represented by Catherine Yarnes. I have carefully reviewed the trial memoranda and arguments of both parties, as well as the testimony and exhibits received at the July 17 hearing. In addition, I have reviewed relevant legal authorities, both as cited to me by the parties and as located through my own research.

The parties raised five major categories of issues: the value of Debtor's real property, Debtor's eligibility to be a debtor under chapter 13, the Kreidler IRA's standing to enforce Claim

---

[1] This disposition is not appropriate for publication, although it may be cited for whatever persuasive value it may have.

Page 1 – MEMORANDUM OPINION

Number 3, the feasibility of Debtor's plan, and the Kreidler IRA's entitlement to relief from the automatic stay. I will address each of these issues in turn.

Valuation of the Collateral

Because other issues, including Debtor's eligibility to seek relief under chapter 13, depend on the value of her real property, I will begin with that dispute. The property is a 1.04 acre site in Gresham, which includes a house and an additional building that is currently used as a multi-unit residence. Hrg. Exh. 8, at 20-23. Debtor offered the testimony of a real estate broker who opined that the property is worth $2.4 million. *See* Hrg. Exh. 6. The Objecting Creditors offered the testimony of a certified appraiser who asserted that the property is worth $1.09 million. Hrg. Exh. 8.

In brief, I find problems with both valuation approaches. The testimony by Debtor's expert obviously suffers from the witness's comparative lack of training and expertise in property valuation. On the other hand, while the Objecting Creditors' expert provided more detail to support his valuation, I am not convinced that he adequately adjusted for the fact that the comparable properties he used were not redeveloped for multifamily housing (even though the evidence established that Debtor's property would most likely be purchased for such redevelopment).

Ultimately, however, I do not need to make a finding regarding value. Assuming without deciding that the Objecting Creditors' proposed value of $1.09 million is correct, the issues in this case that depend on valuation still resolve in Debtor's favor, as discussed in more detail below. Accordingly, I will proceed in this opinion using the $1.09 million figure, although this does not represent a conclusive finding of the court.

Chapter 13 Eligibility

Section 109(e) of the Bankruptcy Code establishes the requirements to be a debtor under chapter 13. Among those requirements is that a debtor's liquidated, non-contingent unsecured

debts must be less than $394,725 on the petition date.[2] The parties dispute whether Ms. Taylor's unsecured debts are under this limit. The dispute arises from a disagreement over whether to count secured debt in excess of the value the collateral, where Ms. Taylor's personal liability was discharged in a prior chapter 7 case. This dispute is easily solved by a case that neither party cited: *Free v. Malaier (In re Free)*, 542 B.R. 492 (9th Cir. BAP 2015). Not only does *Free* directly address the issue in this case, it also succinctly and persuasively explains why two of the cases relied on by the Objecting Creditors (*Johnson v. Home State Bank* and *In re Quintana*) do not compel the result that the creditors would have this court reach. I adopt the reasoning of *Free*, and therefore hold that any unsecured liens for which Ms. Taylor's personal liability has already been discharged do not count as unsecured debt for purposes of the limits in § 109(e).

      Once the parties' legal dispute has been resolved, Debtor's eligibility is simple. Under the assumed value of $1.09 million, and using the claim amounts from paragraph 5 of the parties' statement of agreed facts (ECF No. 51), the math is straightforward: Debtor's 50% interest in the property is worth $545,000, and the first-priority trust deed of $381,913 is fully secured.[3] Assuming that Debtor may claim a $40,000 homestead exemption, that would render the judgment of Asset Systems fully secured and some portion of the first Cahoon judgment secured. Both Cahoon judgments, the Anne Marie Kreidler trust deed, the Greene & Markley judgment, and the McDowell judgment were all entered prior to Debtor's 2011 bankruptcy petition, and therefore any amounts of these claims that are rendered unsecured by virtue of § 506(a) are unenforceable and do not count toward the debt limit. This leaves the Bissonette judgment, of $5,936, which is treated as unsecured. Debtor has listed no unsecured debt on her schedules. When the Bissonette judgment is added to the unsecured debt reflected on the claims register, it yields a total of $112,418.13, well under the limit prescribed by § 109(e).

---

[2] On April 1, 2019, the unsecured debt limit increased to $419,275 pursuant to the Bankruptcy Code's system of automatic inflation adjustments. Because Debtor filed her petition prior to April 1, the lower pre-adjusted figure applies to this case. 11 U.S.C. § 104(c).

[3] For purposes of this calculation, I have adopted the Objecting Creditors' preferred method of accounting for the first-lien trust deed, and have allocated the entire amount of that claim to Debtor's half-interest in the property. I make no determination about the three co-owners' respective liabilities for satisfying this obligation upon sale of the property.

Page 3 – MEMORANDUM OPINION

Case 19-30351-tmb13    Doc 56    Filed 08/06/19

Kreidler IRA's Ability to Enforce the Promissory Note

Debtor has raised serious questions concerning the Kreidler IRA's ability to enforce the admittedly lost promissory note that forms the basis for Claim Number 3. The parties' briefs and trial presentations contained extensive arguments concerning the Kreidler IRA's standing to enforce that note; but, oddly, Debtor has not objected to the Kreidler IRA's proof of claim, and Debtor's proposed plan states that she will pay Claim 3 in full.

The court is only obligated to adjudicate disputes that are actually before it. Here, although Debtor identified issues concerning the Kreidler IRA's claim, she has not asked the court to disallow the claim. Accordingly, the only part of this dispute that is ripe for decision at this time is whether the Kreidler IRA is entitled to adequate protection payments pending the sale of Debtor's property.[4]

I find that the Kreidler IRA is adequately protected, and no periodic payments are required pending the sale of the property. As for the first-lien trust deed, the Kreidler IRA is adequately protected by a substantial equity cushion. As for the first Cahoon judgment, it is true that a sale may not pay this claim in full; however, I do not believe that the Kreidler IRA is entitled to periodic payments. The nature of the claim (a judgment lien) does not include regular contractual payments. Adequate protection payments are designed to compensate a creditor for depreciation in collateral, but that is not required by the facts of this case. Here, the parties largely agree that the value of the collateral comes from the land itself, which does not depreciate. There is no evidence that the Gresham real estate market is declining; to the contrary, the court received evidence that the property was likely to sell for a higher price the more time is allowed for marketing.

---

[4] The Objecting Creditors also argue that the Debtor's proposed plan does not comply with § 1322(b)(2) because it seeks to modify a claim secured by a security interest in the Debtor's principal residence. I explained at the hearing that I was inclined to overrule this objection under the reasoning of *In re Grimes*, No. 08-34275-rld13, 2009 WL 960143 (Bankr. D. Or. Feb. 5, 2019). I adhere to that preliminary conclusion and adopt the reasoning of *Grimes* here.

Feasibility

Objecting Creditors raised several issues concerning Debtor's ability to make all payments and otherwise comply with the terms of the proposed plan. At the July 17 hearing, the objecting creditors produced evidence that the U.S. District Court for the District of Oregon has already held that Anne Marie Kreidler and Michael Reed (collectively, the "Co-Tenants") each own 25% interests in the subject property, and are entitled to share in the property's income and expenses on a proportionate basis. Hrg. Exh. 21 (*Kreidler v. Taylor*, No. 05-cv-1262-BR (D. Or. May 24, 2007).[5] This prior adjudication is binding on this court, and Debtor conceded that she must remit net rents to the Co-Tenants pending sale of the property. I have concerns, however, about Debtor's calculation of net rents and her ability to properly account for the Co-Tenants' funds. Throughout her testimony, Debtor struggled to explain basic financial details of her rental activities and evidence suggests that she claims certain rental expenses on her tax returns which should not be allocated to the Co-Tenants because the expenses do not directly relate to maintenance and preservation of the property.

Based on Debtor's difficulty in answering questions concerning her rental activities, I find that enhanced safeguards are necessary to ensure that Debtor meets her obligations to the Co-Tenants pending a sale of the property. Accordingly, Debtor's plan must be amended to require the following:

1. Consistent with the ruling in *Kreidler v. Taylor*, Debtor must remit the Co-Tenants' respective shares of net rents to the Co-Tenants on a monthly basis. For purposes of this requirement, "net rents" consists of all rent received from renters, less amounts reasonably necessary for preservation and maintenance of the real property

---

[5] The objecting creditors attempted to frame this as an issue of complying with § 1325(a)(3)'s requirement that a plan be "proposed . . . not by any means forbidden by law." I believe this argument fails under the reasoning contained in *Garvin v. Cook Investments NW, SPNWY, LLC*, 922 F.3d 1031, 1035 (9th Cir. 2019) (similar language in § 1129(a)(3) directs courts only to look at the proponent's conduct in proposing a plan, and is not a directive to ensure that the contents of a plan "comply in all respects with the provisions of all nonbankruptcy laws and regulations."). I do, nonetheless, find that Debtor's obligation to pay net rents to the Co-Tenants raises good-faith issues under § 1325(a)(3), as well as questions of feasibility for purposes of § 1325(a)(6).

itself. Expenses that are properly allocated among all three co-owners include amounts actually spent on maintenance, electricity, natural gas, heating oil, water, sewer, and property insurance, as well as a reserve for real property taxes. Expenses that are <u>not</u> properly allocated among the co-owners include telephone, internet, bank fees, and amounts spent on meals or other services provided to tenants.

2. All receipts and disbursements associated with the calculation of net rents must be deposited into and withdrawn from a segregated bank account that is not used for any other purpose. Debtor must promptly provide the Co-Tenants with monthly bank statements as soon as such statements are rendered.

3. Within 21 days following the last day of each month, Debtor must provide the Co-Tenants with an income statement showing her calculation of net rents for the preceding month.

4. If Debtor fails to comply with these procedures, the Co-Tenants must serve a written notice, specifying the event(s) of default, on Debtor and her attorney, giving Debtor 14 calendar days after mailing of the notice to cure the default. If Debtor fails to cure such default within the 14-day period, the Co-Tenants may file a notice of default with the court and seek relief from stay to pursue state-law remedies. If Debtor defaults three or more times during the life of this case, Co-Tenants may seek relief from stay irrespective of any cure.

The Objecting Creditors' remaining feasibility-related objections are overruled. While the Objecting Creditors did identify some understated expenses in Debtor's schedule J, these omissions were more than outweighed by Debtor's exempt Social Security income, which she has stated she will use to fulfill her obligations under the plan. Because this income was not counted in the calculation of Debtor's disposable income, this resolves the Objecting Creditors' other feasibility objections.

Relief from Stay

Debtor has proposed a plan that would pay unsecured creditors in full. The success of this plan depends on Debtor being able to market and sell her real property. Accordingly, relief from stay is not warranted under § 362(d)(2). The Kreidler IRA also seeks relief from stay under § 362(d)(1), arguing that Debtor's failure to pay net rents to the Co-Tenants constitutes cause. Because the record does not indicate that the Co-Tenants have made a concerted effort to demand or otherwise collect their net rents (other than suing Debtor in 2005), I do not find cause to lift the stay at this time. However, as explained above, now that Debtor's obligations to the Co-Tenants are clear, any future failure to remit net rents may be grounds for relief from stay.

Conclusion

For the reasons stated above, Debtor may confirm her plan if it is amended to comply with the requirements of this ruling. Within 14 days of the entry of this opinion, Debtor must: (1) file either an amended plan or submit an order confirming plan (including the necessary amendments via interlineation); and (2) submit an order denying the Kreidler IRA's motion for relief from stay.

###

cc: Ted A. Troutman
     Troy G. Sexton
     Wayne Godare